**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

QUASHAE BROWN, et al.,                                :
    **Plaintiffs**                               :           No. 1:22-cv-00165
                                                      :
    **v.**                                       :           (Judge Kane)
                                                      :
MARYGRACE KEPPLE, et al.,                     :
    **Defendants**                             :

**MEMORANDUM**

This action arises from a 2020 incident in which Plaintiffs Quashae Brown ("Quashae"),

Quanyea Brown ("Quanyea"), and Trinity Tiina Arlez Bellamy Reid ("Trinity") (collectively

"Plaintiffs") were accused of shoplifting from two stores at the Tanger Outlets in Hershey,

Pennsylvania ("Outlets").  Plaintiffs assert civil rights claims under 42 U.S.C. § 1983 and state

law claims against Defendants Mary Grace Kepple ("Kepple"), Dennis Eckenrode

("Eckenrode"), Rian Bell ("Bell"), Rebecca Kessler ("Kessler"), and Tom Pavone ("Pavone")

(collectively "Defendants"), all of whom are police officers of the Derry Township Police

Department.  Before the Court is Defendants' motion for summary judgment.  (Doc. No. 108.)

For the following reasons, the Court will grant in part and deny in part Defendants' motion.

I.      **BACKGROUND**

    A.      **Factual Background**[1]

On December 22, 2020, Dauphin County 911 ("dispatch") received a call at 12:51 p.m.

from Beth Anne Staton ("Staton"), an employee at the Old Navy store ("Old Navy") located at

_____

[1]  The following relevant facts of record are taken from Defendants' statement of material facts
("SMF") and Plaintiffs' response to Defendants' statement of material facts ("RSMF"), and are
undisputed unless otherwise noted.  Both the SMF and RSMF contain specific citations to the
record at each numbered paragraph.

the Outlets.[2]  (Doc. Nos. 110 ¶¶ 2, 38–39; 115 ¶¶ 2, 38–39.)  Staton identified herself to dispatch

as the general manager of Old Navy.[3]  (Doc. Nos. 110 ¶ 6; 115 ¶ 6.)  She advised dispatch that

she had spoken with her "loss prevention managers"[4] who wanted her to call dispatch.  (Doc.

Nos. 110 ¶ 5; 115 ¶ 5.)  Staton said that a retail theft had taken place only 5 to 10 minutes earlier.

(Doc. Nos. 110 ¶ 8; 115 ¶ 8.)  She told dispatch that the suspects left in a car and that "we do

have a picture of the car and its license plate."  (Doc. Nos. 110 ¶ 9; 115 ¶ 9.)  Staton also

provided a description of the individual suspects to dispatch.  (Doc. Nos. 110 ¶ 26; 115 ¶ 26.)

Staton called dispatch "to investigate whether a retail theft occurred" and "concedes that she

knows a retail theft is a crime."  <u>See</u> (Doc. Nos. 110 ¶ 31; 115 ¶ 31) (internal citations omitted).

Plaintiffs do not dispute the authenticity of the 911 call recording, but claim that the 911

call recording is immaterial because "there are no facts of record tending to prove that any of the

---

[2]  A recording of the 911 call, along with video surveillance footage of Old Navy, are docketed at Docket Number 118.  Citations are to the timestamp and are displayed in [mm:ss] format.  The Court notes that Plaintiffs maintain that the 911 call recording is immaterial because Defendants did not listen to the 911 call.  <u>See</u> (Doc. No. 115 ¶¶ 5–6, 8–9).

[3]  Staton has been employed by Old Navy since February 2010, and became the general manager of Old Navy in 2018.  (Doc. Nos. 110 ¶ 12; 115 ¶ 12.)  At the time of the incident, Staton managed approximately 65 employees.  (Doc. Nos. 110 ¶ 13; 115 ¶ 13.)

[4]  According to Staton, retail theft is common at Old Navy and the problem is "a little bit worse during the holidays."  (Doc. Nos. 110 ¶ 20; 115 ¶ 20.)  Staton testified that she does not always report suspected retail theft to police and only does when her asset protection manager tells her to report it to police.  (Doc. Nos. 110 ¶ 21; 115 ¶ 21.)  She also stated that there was a procedure in place for calling the police regarding incidences of retail theft.  (Doc. Nos. 110 ¶ 22; 115 ¶ 22.)  If there was a suspicion of theft, Staton testified that she would call her asset protection manager, describe everything to him, share with him what was found on video, and he would provide instruction on what to do.  (<u>Id.</u>)  Old Navy's procedures describe the same process.  (Doc. Nos. 110 ¶ 23; 115 ¶ 23.)  If it was a "known theft," Staton testified that "we would provide again the CD's, descriptions of the people, and those kinds of things."  (Doc. Nos. 110 ¶ 24; 115 ¶ 24.)

defendant police officers heard any portion of the 911 call prior to encountering, detaining, and/or arresting Plaintiffs."  See (Doc. No. 115 ¶¶ 5–6, 8–9).

Officers arrived on the scene at 12:54 p.m.  (Doc. Nos. 110 ¶ 40; 115 ¶ 40.)  Kepple was the supervising officer on scene for the investigation.  (Doc. Nos. 110 ¶ 42; 115 ¶ 42.) Defendants checked the area around Old Navy but were unable to find the vehicle identified in the dispatch call.  (Doc. Nos. 110 ¶ 43; 115 ¶ 43.)  Kepple went into Old Navy and went to Staton's office.  (Doc. Nos. 110 ¶¶ 43–44; 115 ¶¶ 43–44.)  When Kepple arrived in Staton's office, Staton was viewing a video of the alleged retail theft and pointed out the three suspects on the video.  (Doc. Nos. 110 ¶ 18; 115 ¶ 18.)  Staton provided a description of the individual suspects and a copy of the store surveillance CD to Kepple.[5]  (Doc. Nos. 110 ¶ 26; 115 ¶ 26.) Kepple herself did not watch the video footage in Staton's office.[6]  (Doc. Nos. 110 ¶ 55; 115 ¶ 55.)  Eckenrode was also present in Staton's office with Kepple for approximately five (5) minutes until Staton provided him with a picture of the suspect vehicle because the license plate number Staton provided in her 911 call was "no good." [7]  (Doc. Nos. 110 ¶¶ 47–52; 115 ¶¶ 47–

---

[5]  As noted supra at note 2, the video footage is docketed at Docket Number 118.

[6]   In the incident report she authored after she watched the video footage at the police station (Doc. No. 110-4), Kepple summarized the video as follows:

1.   B/F wearing a waist length white puffy coat with the hood up, jeans, and white sneakers.
2.   B/F wearing a short metallic silver jacket, jeans and a maroon do-rag around her head.
3.   B/F wearing a longer grey hoodie with hood up and jeans.
     All subjects were wearing masks in compliance with COVID-19 restrictions in the store.

(Doc. Nos. 110 ¶ 18; 115 ¶ 18.)  "B/F" means "Black Female."  Plaintiffs are African American.

[7]  Eckenrode's supplemental report provides:

52.)  Kepple provided Staton with a statement form and told Staton that she would come back to collect Staton's completed statement later.[8]  (Doc. Nos. 110 ¶ 54; 115 ¶ 54.)  In her voluntary handwritten statement, Staton confirmed that Old Navy was "[n]otified by The Gap the three BLK females w/hoods up were acting suspicious.  We got a full description of them.  They came into the store at 12:11 p.m. and went straight to the toddler boy grabbing items and tucking behind fixtures."  (Doc. Nos. 110 ¶ 28; 115 ¶ 28.)  Kessler later collected Staton's completed statement.  See (Doc. Nos. 110 ¶ 28; 115 ¶ 28) (citing Doc. No. 110-5 (Kessler's deposition transcript) at 5, Tr. 19:2–5).

The parties agree that Kepple left Old Navy and did not watch the video (Doc. Nos. 110 ¶ 55; 115 ¶ 55), but Plaintiffs dispute "the reasonableness of Kepple's chosen course of conduct "in not immediately reviewing the video to see if it actually showed the retail theft Ms. Staton was reporting" (Doc. No. 115 ¶ 55).  The parties agree that Kepple and Eckenrode then went to The Gap (Doc. Nos. 110 ¶¶ 56–57; 115 ¶¶ 56–57), but the parties dispute why Kepple and Eckenrode went to The Gap after Old Navy.  Compare (Doc. Nos. 110 ¶ 53; 115 ¶ 53).[9]  En

---

  [Staton] pulled up the photo on her phone so I could email it to Officer Kepple and myself to bring it up on the bigger screen in the car to try and make out the registration plate. She pulled it up and then sent it to our emails from her phone.

(Doc. Nos. 110 ¶ 52; 115 ¶ 52.)

[8]  The parties do not dispute this fact, but dispute the proper record citation to support the fact. See (Doc. Nos. 110 ¶ 54; 115 ¶ 54).

[9]  Defendants claim that Eckenrode overheard Staton telling Kepple that Staton got a call from The Gap and that the three black females that stole from her store had stolen from The Gap and "cleaned them out" or words to that effect.  (Doc. No. 110 ¶ 53.)  Plaintiffs dispute this, stating that Defendants' characterization and description of Eckenrode's testimony is incomplete and inaccurate.  (Doc. No. 115 ¶ 53.)  According to Plaintiffs, Eckenrode testified that "cleaned them out" was a direct quote from Staton.  (Id.)  However, Plaintiffs claim that this statement is at odds with not only Kepple's testimony that the quote from Staton was that the suspects had "stolen from [The Gap] big time" (which Plaintiffs claim Kepple also testified were the words

4

route to The Gap, Eckenrode observed the suspect vehicle, a silver Chevrolet Cavalier with the same license plate provided by Staton, in the parking area near The Gap.  (Doc. Nos. 110 ¶¶ 56–57; 115 ¶ 56–57.)  The suspect vehicle's backseat was "covered with shopping bags."  (Doc. Nos. 110 ¶ 61; 115 ¶ 61.)

Kepple and Eckenrode observed two young women who matched the descriptions provided by Staton.  (Doc. Nos. 110 ¶ 58; 115 ¶ 58.)  Plaintiffs do not dispute this, but add that the two young women were Plaintiffs Quanyea and Trinity.  (Doc. No. 115 ¶ 59.)  Kepple and Eckenrode spoke with Quanyea and Trinity regarding what was alleged to have occurred at the Old Navy, and informed Quanyea and Trinity that they were being accused of retail theft.  (Id.)  Quanyea and Trinity denied committing retail theft.  (Doc. Nos. 110 ¶ 59; 115 ¶ 59.)  Kepple and Eckenrode advised Quanyea and Trinity that they would have to be detained until Defendants completed their investigation of the retail theft complaint.  (Doc. Nos. 110 ¶¶ 59–60; 115 ¶¶ 59–60.)  Quanyea and Trinity were detained and placed in the back of the police vehicles by Eckenrode and Kepple.[10]  (Doc. Nos. 110 ¶ 59; 115 ¶ 59.)  The parties dispute the involvement of Bell and Pavone in the incident.  Compare (Doc. Nos. 110 ¶ 76; 115 ¶ 76).[11]

---

that came over the dispatch (Doc. No. 115 ¶ 34)), but also with Staton's testimony that she never made any comment to Kepple about items reportedly being stolen from The Gap (id. ¶ 53). Although Staton denied that she said that the suspects had "stolen from The Gap "big time," she could not think of a reason why there would be quotations around that statement unless she had given it to the officer.  (Doc. Nos. 110 ¶ 34; 115 ¶ 34.)

[10]  Plaintiff Quashae was also detained, but the parties do not address the factual circumstances under which she was detained in the SMF and the RSMF.  See (Doc. No. 110-11 (Quashae's deposition testimony) at 14–15, Tr. 29:1–30:25).

[11]  Defendants argue that there is no evidence of wrongdoing by Defendants Bell and Pavone. (Doc. No. 110 ¶ 76.)  However, Plaintiffs note that Bell initially responded to the scene with Kepple.  See (Doc. No. 115 ¶ 76) (citing Doc No. 110-8 (Kepple's deposition transcript) at 5, Tr. 18:1–15).  Plaintiffs posit that Bell "arrested Quashae Brown, held her in custody, and transported her from the scene to the police station where she was locked in a jail cell."  See

Kepple contacted the owner of the suspect vehicle, Trinity's mother Lisa Bellamy ("Bellamy"), via phone around 1:30pm, and advised Bellamy that "they were investigating a retail theft claim at The Gap and Old Navy and that Trinity was detained."  (Doc. No. 110 ¶ 62.) Defendants claim that Bellamy indicated over the phone that she could be at the scene in ten (10) minutes (Doc. No. 110 ¶ 62)—however, Plaintiffs dispute this, stating that Bellamy has no recollection of making such a comment (Doc. No. 115 ¶ 62).  Plaintiffs also maintain that Kepple never asked any of the Plaintiffs for permission to search the vehicle prior to Kepple calling Bellamy.  (Id.)  The parties dispute how long it took Bellamy to arrive—Defendants assert it was forty-five (45) minutes while Plaintiffs maintain that it was approximately thirty (30) minutes. Compare (Doc. Nos. 110 ¶¶ 63–64; 115 ¶¶ 63–64).  Defendants claim that, after waiting forty-five (45) minutes for Bellamy to arrive, Kepple "determined that she needed to free up some of her officers to be available to answer other calls and accordingly made the decision to transfer Plaintiffs back to the station."[12]  (Doc. No. 110 ¶ 64.)  Plaintiffs dispute the assertion that forty-

---

(id.); see also (Doc. Nos. 110-4 (Kepple's incident report) at 5; 110-8 (Kepple's deposition transcript) at 19–20, 27, Tr. 76:21–77:8, 105:2–9).  As to Pavone, Plaintiffs maintain that Pavone "arrived at the scene in response to Kepple's request for a member of the police department's criminal investigation unit."  See (Doc. No. 115 ¶ 76) (citing 110-8 (Kepple's deposition transcript) at 21, Tr. 81:3–9).  Plaintiffs claim that Pavone and Kepple waited together at the scene for Bellamy to arrive.  See (id.) (citing Doc. Nos. 110-4 (Kepple's incident report) at 5; 110-8 (Kepple's deposition transcript) at 20, Tr. 80:12–13).  As discussed infra, the parties agree that Pavone and Kepple later inventoried the bags from the subject vehicle upon their return to the police station.  (Doc. Nos. 110 ¶ 67; 115 ¶ 67.)

[12]  As noted supra, Bell transported Quashae to the police station.  The parties do not discuss Kessler's involvement in the transportation in the SMF and RSMF, but Kessler testified that:

> I asked Miss Staton for the description of the females again because the young ladies were stating that we had the wrong people.  So she looked up a section of the video to provide the—the best image with the individuals on it so that we could see clearly what they were wearing.  And then I went back and reported to Officer Kepple that, according to the images that Miss Staton showed me, we have the right individuals. Officer Kepple moved her subjects to my vehicle and asked me to

five (45) minutes had passed and dispute the reasonableness of Kepple's "choice to not watch the surveillance video in Ms. Staton's office and to instead extend and escalate Plaintiffs' detention by directing that they be transported from the Outlets to the police station." (Doc. No. 115 ¶ 64.) The parties do not agree on when Bellamy arrived and Defendants do not state in their SMF how Kepple and Pavone acquired the bags found in the subject vehicle.[13]

Kepple obtained the statement of Tania Roman ("Roman") at The Gap[14] who explained that Plaintiffs were acting suspiciously and admitted that she had contacted Old Navy to let them know. (Doc. Nos. 110 ¶ 66; 115 ¶ 66.) Roman denied telling anybody at Old Navy that Plaintiffs had stolen anything. (Id.)

The parties agree that Kepple and Pavone returned to the station and inventoried the bags found in the back of the subject vehicle. (Doc. Nos. 110 ¶ 67; 115 ¶ 67.) The inventorying of the bags took approximately fifteen (15) minutes. (Id.) Kepple reviewed the surveillance video

---

transport that subject back to station. We transported all three females back to station. The two adults, I checked them to make sure that there was no merchandise on them and remove any items that they weren't allowed to have on them in the cell and secured their items and secured them in their—in the cells. And then the juvenile, I placed in the juvenile area, and the—Officer Eckenrode watched the juvenile through the window. I believe I checked the juvenile, but I didn't remove anything from the juvenile because Officer Eckenrode was maintaining eye—visual contact with the juvenile.

(Doc. No. 110-5 (Kessler's deposition transcript) at 5, Tr. 20:12–21:1.) In her deposition, Kepple stated that she transferred Quanyea to Kessler's vehicle to take Quanyea to the police station. (Doc. No. 110-8 (Kepple's deposition transcript) at 20, Tr. 80:8–24.)

[13] Although Defendants do not address this issue in the SMF, the police incident report attached to Defendants' SMF notes that Bellamy removed all the bags from the vehicle and gave them to Pavone, who took them to the station. (Doc. No. 110-4 (Kepple's incident report) at 5.)

[14] Defendants do not specifically state that Roman was an employee of The Gap, but Plaintiffs' RSMF notes that Roman worked at The Gap and had contacted her sister who worked at Old Navy. (Doc. No. 115 ¶ 33.)

footage after inventorying the bags.  (Doc. Nos. 110 ¶ 68; 115 ¶ 68.)  The parties dispute what the video footage appears to show,[15] but agree that Kepple confirmed that there was no retail theft.  See (Doc. Nos. 110 ¶¶ 69–70; 115 ¶¶ 69–70).  After Kepple's review of the video footage, Plaintiffs were released.  (Doc. Nos. 110 ¶ 71; 115 ¶ 71.)  No charges were filed, and the complaint made by Staton was "cleared as unfounded."  (Doc. Nos. 110 ¶¶ 72–73; 115 ¶¶ 72–73.)

### B.    Procedural Background

On February 2, 2022, Quanyea and Quashae filed a complaint against The Gap, Kepple, Eckenrode, Bell, Kessler, Pavone, and Derry Township, asserting claims of wrongful use of process, civil rights violations, and state law claims, as well as requesting injunctive relief.  (Doc. No. 1.)  A day later, Trinity filed her own complaint.  Cf. Bellamy v. The Gap, No. 1:22-cv-00171 (M.D. Pa. February 3, 2022), ECF No. 1.  Both complaints asserted identical claims against the same defendants, with minor differences in formatting and font.  See (Doc. No. 1); Bellamy v. The Gap, No. 1:22-cv-00171 (M.D. Pa. February 3, 2022), ECF No. 1.

On April 4, 2022 and April 6, 2022, Defendants Bell, Eckenrode, Kepple, Kessler, Pavone, and Derry Township ("the Township Defendants") filed two identical motions to dismiss both complaints for failure to state a claim upon which relief can be granted.  See (Doc. No. 12); Bellamy v. The Gap, No. 1:22-cv-00171 (M.D. Pa. April 6, 2022), ECF No. 12. Thereafter, on April 29, 2022, the Court issued an Order consolidating the cases into the instant action.  (Doc. No. 18.)  The Gap filed a motion to dismiss both complaints on May 9, 2022.

---

[15]  Defendants claim that upon Kepple's first inspection of the video, "it appeared as though one of the suspects stuffed a onesie into her pocket," but that after looking at the video three (3) times, Kepple confirmed that there was no retail theft and that the onesie was put back on the shelf.  (Doc. No. 110 ¶¶ 69–70.)  Plaintiffs dispute the assertion that on a first or second look, the video appears to show anyone stuffing a onesie in her pocket.  (Doc. No. 115 ¶¶ 69–70.)

(Doc. No. 21.)  As a result of the motions to dismiss, Plaintiffs filed two identical amended complaints—one by the Browns and one by Trinity.  (Doc. Nos. 26–27.)  In their amended complaints, Plaintiffs asserted state law claims for abuse of process against The Gap (Count I); claims for violations of their Fourth and Fourteenth Amendment rights against the Township Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") under theories of unreasonable seizure, false imprisonment, and false arrest (Count II); and state law claims against the Township Defendants for willful misconduct, negligence, assault, battery, false arrest, and false imprisonment (Count III).  (Doc Nos. 26 ¶¶ 62–80; 27 ¶¶ 69–89.)  The Gap and the Township Defendants filed their motions to dismiss Plaintiffs' amended complaints on June 21, 2022 (Doc. Nos. 30–32, 34), followed by briefs in support of their respective motions (Doc Nos. 33, 35, 37, 51).  Plaintiffs filed briefs in opposition (Doc. Nos. 39–41, 52), the last of which was filed by Trinity on August 3, 2022 (Doc. No. 52).  The Gap filed reply briefs on July 19, 2022.  (Doc. Nos. 44–45.)

On December 14, 2022, the Court issued a Memorandum and Order granting Defendants' motions to dismiss in part and denying Defendants' motions to dismiss in part.  (Doc. Nos. 59–60.)  The Court dismissed Plaintiffs' <u>Monell</u> claims against the Township Defendants without prejudice and dismissed Plaintiffs' claims against The Gap without prejudice, but the Court permitted Plaintiffs to file amended complaints to "attempt to address the pleading deficiencies identified in the accompanying Memorandum pertaining to Plaintiffs' <u>Monell</u> claims against the Township Defendants and their claims against [The Gap]."[16]  (Doc. Nos. 59 at 21–25, 27–31; 60

---

[16]  "When a suit against a municipality is based on [42 U.S.C.] § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom."  <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966 (3d Cir. 1996) (citing <u>Monell v. N.Y.C. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978)) (defining a <u>Monell</u> claim).

¶¶ 1–3.)  In relevant part, the Court denied Defendants' motions to dismiss in part as to Plaintiffs' Fourth and Fourteenth Amendment claims against the Township Defendants pursuant to Section 1983 as well as claims of qualified immunity by Defendants Bell, Eckenrode, Kepple, Kessler, and Pavone ("Officer Defendants") and Plaintiffs' state law claims.  (Doc. Nos. 59 at 7–21, 25–27; 60 ¶ 1.)  For purposes of the motions to dismiss and after accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court found that Plaintiffs plausibly alleged that the Officer Defendants lacked probable cause to arrest them and thus adequately stated unreasonable seizure, false arrest, and false imprisonment claims against the Officer Defendants.  (Doc. No. 59 at 9–10.)  As to Plaintiffs' Fourteenth Amendment equal protection claims, the Court found that Plaintiffs sufficiently alleged an equal protection claim that they were "wrongfully targeted, seized, detained, and arrested due not to objective proof of criminal activities but to the Officer Defendants' discriminatory biases."  (Id. at 13.)  The Court was unable to conclude—as a matter of law—that any of the Officer Defendants were entitled to qualified immunity.  (Id. at 20–21.)  The Court found that Plaintiffs stated "prima facie causes of action" for assault, battery, and false arrest and imprisonment because Plaintiffs "plausibly alleged that the Officer Defendants used force to restrain them, intended to and did confine Plaintiffs in a manner that harmed them, and lacked probable cause to do so."  (Id. at 26.)

On December 22, 2022, in accordance with the Court's December 14, 2022 Memorandum and Order, Plaintiffs filed second amended complaints, again with one filed by the Browns and one filed by Trinity, as to Counts I and III.  (Doc. Nos. 61–62.)  Plaintiffs' second amended complaints asserted the following claims: malicious abuse of process/malicious prosecution against The Gap (Count I); civil rights violations under 42 U.S.C. § 1983 and the

Fourth and Fourteenth Amendments (Count II) against the Officer Defendants;[17] a <u>Monell</u> claim

against Derry Township (Count III); and state law claims of willful misconduct, negligence,

assault, battery, and false imprisonment (Count IV).  <u>See id.</u>  The Township Defendants and The

Gap again filed motions to dismiss and supporting briefs in response to the second amended

complaints.  (Doc. Nos. 71–76, 80–81.)  Plaintiffs filed briefs in opposition in February 2023

(Doc. Nos. 79; 82–84), and Plaintiffs filed reply briefs in late February and early March 2023

(Doc. Nos. 85–88).

On May 31, 2023, the Court issued a Memorandum and Order addressing only the

malicious abuse of process/malicious prosecution claims against The Gap (Count I) and the

<u>Monell</u> claim against Derry Township (Count III) because those were the two sets of claims that

the Court granted Plaintiffs leave to amend in its December 14, 2022 Memorandum and Order.[18]

(Doc. No. 92 at 6.)  In its May 31, 2023 Memorandum and Order, the Court found that Plaintiffs

failed to allege facts showing the existence of a policy or a custom attributable to Derry

Township, granting the Township Defendants' motion to dismiss Plaintiffs' <u>Monell</u> claims and

dismissing these claims against Derry Township (Count III) with prejudice.  (Doc. Nos. 92 at

11–12; 93 ¶ 1.)  The Court also found that Plaintiffs failed to state malicious prosecution claims

against The Gap, granting The Gap's motion to dismiss and dismissing Plaintiffs' claims against

The Gap (Count I) with prejudice.  (Doc. Nos. 92 at 15–17; 93 ¶ 2.)

---

[17]  In their amended complaints and second amended complaints, Plaintiffs make the same
claims under Count II, but the second amended complaint alleges these claims against only the
Officer Defendants (who are the current Defendants).  <u>See</u> (Doc. Nos. 26–27, 61–62).

[18]  The Court noted that the two sets of claims were "the only two claims properly before the
Court.  The Court will disregard the Township Defendants' attempt to relitigate—without having
filed a timely motion to reconsider—the Court's prior ruling that Plaintiffs sufficiently stated an
equal protection claim as to the Officer Defendants."  (Doc. No. 92 at 6–7.)

The remaining parties attempted to effectuate settlement of Counts II and IV after referral to Magistrate Judge Schwab.[19]  (Doc. No. 100.)  On September 11, 2023, Magistrate Judge Schwab held a telephone status conference with the parties, during which the parties maintained that they were not in a position to settle the case.  (Doc. No. 102.)  On October 17, 2023, the Court held a status conference with the parties and thereafter issued an Order setting a summary judgment deadline of November 17, 2023.  (Doc. Nos. 104–05.)  On November 17, 2023, Defendants jointly filed the instant motion for summary judgment as well as a supporting brief and statement of material facts with exhibits.  (Doc. Nos. 108–10.)  Plaintiffs filed a brief in opposition to the motion along with a response to Defendants' statement of material facts and exhibits.  (Doc. Nos. 115–16.)  Defendants thereafter filed a reply brief.  (Doc. No. 117.)  Accordingly, the motion for summary judgment has been fully briefed and is ripe for disposition.

## II.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis to permit a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all

---

[19]  As noted supra, the remaining parties are Plaintiffs (Quanyea, Quashae, and Trinity) and Defendants (Bell, Eckenrode, Kepple, Kessler, and Pavone).  See (Doc. Nos. 97, 108).

evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).  The inference(s) drawn in favor of the non-moving party cannot be improbable.  See In re Weinstein Co. Holdings, LLC, 997 F.3d 497, 510 (3d Cir. 2021).  The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine dispute of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252.  Summary judgment is not precluded by irrelevant or unnecessary factual disputes.  See Lower Susquehanna Riverkeeper v. Keystone Protein Co., 520 F. Supp. 3d 625, 637 (M.D. Pa. 2021).

When there is videotaped evidence in the record, the court is obliged to consider it when determining whether there is a genuine dispute of material fact, and the Court must view the facts in the light depicted by the videotape.  See Scott v. Harris, 550 U.S. 372, 380–81 (2007);

13

see also El v. City of Pittsburgh, 975 F.3d 327, 333 (3d Cir. 2022) (stating, in the context of the review of a denial of summary judgment based on qualified immunity, that if "there is a video in the record 'capturing the events in question,' we must accept the trial court's factual determinations unless they are 'blatantly contradicted' by the video").

## III.   DISCUSSION

In their motion for summary judgment and associated briefing, Defendants challenge the remaining Counts (Counts II and IV) of Plaintiffs' second amended complaints, arguing as follows: (1) Plaintiffs were subject to a lawful investigatory detention because Defendants "possessed reasonable suspicion provided from the purported victim [Staton] that a crime had been committed and that Plaintiffs had committed such crime"; (2) Defendants are entitled to qualified immunity "in light of the state of the law on probable cause where they relied upon firsthand information from the purported victim of a crime [Staton] that a crime had been committed and that Plaintiffs committed such crime"; (3) Defendants "acted in a race neutral manner and did not violate Plaintiffs' Equal Protection rights"; (4) Plaintiffs' state law claims fail due to Defendants' "lawful formulation of probable cause"; and (5) Defendants Pavone and Bell[20] "ought to be dismissed as a matter of law because there are no claims or evidence against them."  (Doc. No. 109 at 10–30.)

The Court first addresses Defendants' claim that they are entitled to summary judgment on Count II as to Plaintiffs' equal protection claim before addressing Plaintiffs' Fourth Amendment claims under Count II, including Defendants' argument that they are entitled to

---

[20]  The question presented by Defendants in their supporting brief is "[w]hether Defendants Pavone, Bell, And Rian Ought To Be Dismissed As A Matter Of Law Because There Are No Claims Or Evidence Against Them?"  See (Doc. No. 109 at 8, 29).  However, it appears that Defendants meant to express their desire to dismiss only two Defendants, Pavone and Bell, because "Rian" and "Bell" are a singular person, Officer Rian Bell.

qualified immunity.  Finally, the Court addresses Defendants' arguments as to Plaintiffs' state law claims.

A.    **Plaintiffs' Section 1983 Claims for Violations of the Fourth Amendment and Fourteenth Amendments**

Plaintiffs assert their Fourth and Fourteenth Amendment claims against Defendants pursuant to 42 U.S.C. § 1983 (Count II) claiming violations of their rights to be secure in their persons from an unlawful search and seizure and to equal protection of the laws under the Fourth and Fourteenth Amendments.

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See id.  Section 1983 is not a source of substantive rights but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)).  To maintain a cause of action under Section 1983, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States.  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).

Plaintiffs assert two federal claims under Count II— first, for violations of their Fourth Amendment right to be free from unlawful seizures, arrests, and detentions, and second, for violations of their Fourteenth Amendment equal protection rights.  The Court first discusses Plaintiffs' claims under the Fourteenth Amendment before discussing their claims under the Fourth Amendment.

### 1.    Plaintiffs' Claims under the Fourteenth Amendment

#### a.    Applicable Legal Standard

The Fourteenth Amendment Equal Protection Clause declares that "[n]o State shall . . . deny any person within its jurisdiction the equal protection of the laws."  See U.S. Const. amend. XIV, § 1.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  "The [E]qual [P]rotection [C]lause requires equality of treatment before the law for all persons without regard to race or color."  Students for Fair Admissions, Inc. v. President of Harv. Coll., 600 U.S. 181, 205 (2023) (internal quotations omitted).

To succeed on an equal protection claim based on selective enforcement or racial profiling, a plaintiff must show that police actions "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose."  See Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).  For the purpose of the first prong of this inquiry, a party must "show that [they are] a member of a protected class and that [they were] treated differently from similarly situated individuals in an unprotected class."  See id. at 206.  "Discriminatory effect may be proven by naming similarly situated members of an unprotected class who were not selected for the same search or, in some cases, by submitting statistical evidence of bias."  Id.  In racial profiling cases, "where it is often difficult to submit direct evidence that members of an unprotected class were

not targeted for a search, statistical evidence of discrimination may be the only means of proving a discriminatory effect."  See id. at 206 n.11.

### b.      Arguments of the Parties

Defendants maintain that they are entitled to summary judgment as to Plaintiffs' claim that they violated Plaintiffs' equal protection rights under the Fourteenth Amendment Equal Protection Clause.  (Doc. No. 109 at 26.)  Defendants argue that "[t]o the extent that Plaintiffs are making an equal protection claim based on selective enforcement or racial profiling, such a claim must fail."  (Id.)  Defendants claim that there is no evidence in the record that Plaintiffs' race played a role in Defendants' investigation beyond their initial evaluation and that there are no facts to establish that Plaintiffs were treated differently than similarly situated individuals in an unprotected class.  (Id. at 26–27.)  Defendants maintain that their identification of Plaintiffs as African American females does not show racial prejudice, citing Brown v. City of Oneonta, 221 F.3d 329, 333–34 (2d Cir. 2000), rehearing and rehearing en banc denied, 235 F.3d 769 (2000), cert. denied, 122 S. Ct. 44 (2001) (holding that when law enforcement officials possess a description of a suspect, even if the description consists primarily of race and gender, absent other evidence of discriminatory racial animus, law enforcement could act on the basis of the description without violating equal protection).  (Id.)  Defendants posit that Plaintiffs have failed to identify facts in the record that show that Plaintiffs' investigatory detention was "in any way racially motivated."  (Id. at 18.)  Based on the lack of evidence in the record and because Defendants assert that they are entitled to qualified immunity, Defendants assert that Plaintiffs' equal protection claim must fail as a matter of law.  (Id.)

Plaintiffs argue that the record contains various facts from which a reasonable jury could

find that Defendants violated Plaintiffs' equal protection rights.  (Doc. No. 116 at 30.)  Plaintiffs

argue the following:

> The Plaintiffs are African American females.   Throughout the Defendants'
> investigative narratives, the Defendants identify them as such.    While the
> Defendants canvased the scene between Old Navy and Gap, taking their time to
> discuss the allegations against the Plaintiffs (which, in at least one case, i.e., the
> allegation that they had stolen "big time" from Gap, was flatly denied by the
> supposed witness) they made no effort to afford the Plaintiffs the opportunity to
> rebut the allegations of Ms. Staton, despite their offers to do so.  Further, the three
> young women are handcuffed and corralled into police cars for almost an hour
> while the Defendants elected not to review the video surveillance.  Later, the
> Plaintiffs, who had been nothing but cooperative and presented no threat of harm,
> were locked in cells.

(Id. at 30–31.)  Plaintiffs posit that these facts call into question whether Defendants would have

treated non-African American individuals similarly, and on that basis, the equal protection

claims should be submitted to the jury.  (Id.)

### c.   Analysis

As set forth supra, Plaintiffs must show that Defendants' actions "(1) had a

discriminatory effect and (2) were motivated by a discriminatory purpose."  See Bradley, 299

F.3d at 205.  To prove discriminatory effect, Plaintiffs must "show that [they are] a member of a

protected class and that [they were] treated differently from similarly situated individuals in an

unprotected class."  See id. at 206.

First, Plaintiffs are African American women, and are thus members of a protected

class.[21]  Thus, to prove discriminatory effect, the inquiry is whether Plaintiffs submitted evidence

---

[21]  In its December 14, 2022 Memorandum and Order, as discussed supra, the Court found that:

> Plaintiffs—who are African American and therefore belong to a protected class—
> have sufficiently alleged an equal protection claim based on the allegations that

that Defendants treated them differently from similarly situated members of an unprotected class.

However, Plaintiffs have put forth no direct evidence to satisfy their prima facie burden which

requires more than conclusory statements.[22]  Plaintiffs cannot rely on "bare assertions" to resist

summary judgment.  See Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

In Bradley, the Third Circuit noted that it may be difficult to show racial profiling

through direct evidence and stated that "statistical evidence" may be the only means to prove

discriminatory effect.  See Bradley, 299 F.3d at 206 n.11.  Plaintiffs have not submitted

statistical evidence of bias to support their claims.  Accordingly, Plaintiffs have not raised a

genuine dispute of material fact as to whether defendants acted out of discriminatory animus.

See Strickland v. Mahoning Township, No. 08-cv-01570, 2010 WL 1328885, at *5 (M.D. Pa.

Mar. 30, 2010) (granting summary judgment in favor of police defendants on an equal protection

claim when the plaintiff had not "raised a genuine issue of material fact as to whether defendants

acted out of discriminatory animus").  The Court will therefore grant Defendants' motion for

summary judgment as to Plaintiffs' equal protection claim under Count II.

### 2.     Plaintiffs' Claims under the Fourth Amendment

---

they were wrongfully targeted, seized, detained, and arrested due not to objective
proof of criminal activities but to the Officer Defendants' discriminatory biases.

(Doc. No. 59 at 13.)

[22] "The non-moving party cannot rest on mere pleadings or allegations," El v. Se. Pa. Transp.
Auth., 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a
genuine issue for trial."  See Saldana v. Kmart Corp., 260 F.3d 228, 231–32 (3d Cir. 2001).  In
fact, "mere conclusory allegations" in a complaint or "self-serving testimony" in a sworn
statement "cannot be used to obtain or avoid summary judgment when uncorroborated."  See
Hubert v. Luscavage, No. 21-cv-01523, 2023 WL 4306753, at *3 (M.D. Pa. June 30, 2023)
(citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)); see also Bhatla v. U.S. Cap.
Corp., 990 F.2d 780, 787 (3d Cir. 1993) (stating that "to defeat a motion for summary judgment,
a party cannot rest simply on the allegations in the pleadings").

Plaintiffs assert violations of their Fourth Amendment right to be free from unlawful seizures, arrests, and detentions (Count II).  As noted supra, the Court, in a previous Memorandum and Order, found that Plaintiffs adequately stated unreasonable seizure, false arrest, and false imprisonment claims against the Officer Defendants.  (Doc. No. 59 at 9–10.)

### a.    Applicable Legal Standard

The Fourth Amendment protects against unreasonable searches and seizures and is enforceable against the states through the Fourteenth Amendment Due Process Clause.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961).  A person is seized for Fourth Amendment purposes if the person is detained by means intentionally applied to terminate their freedom of movement.  See Brendlin v. California, 551 U.S. 249, 254 (2007).  As discussed by the Court in its previous Memorandum addressing the first set of motions to dismiss:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  See U.S. Const. amend. IV. The scope of what may be considered a Fourth Amendment seizure is broader than an arrest, see Black v. Montgomery Cnty., 835 F.3d 358, 365 (3d Cir. 2016), as amended (Sept. 16, 2016), and goes beyond situations that involve "a trip to the station house" followed by prosecution, see Terry v. Ohio, 392 U.S. 1, 16 (1968). The Third Circuit has adopted the theory of a "continuing seizure," as expressed by Justice Ginsburg in her concurrence in Albright v. Oliver, 510 U.S. 266 (1994). See Black, 835 F.3d at 366-67. Under the "continuing seizure" theory, a Fourth Amendment seizure may encompass pretrial restrictions short of an arrest. See Schneyder v. Smith, 653 F.3d 313, 320 (3d Cir. 2011).

(Doc. No. 59 at 8.)  To establish an unlawful seizure under the Fourth Amendment, a plaintiff must show that the defendant's actions (1) constituted a "seizure" within the meaning of the Fourth Amendment and (2) that the seizure was "unreasonable" in light of the surrounding circumstances.  See Brower v. County of Inyo, 489 U.S. 593, 595–600 (1989).

A suspect is considered under arrest when a police officer interrupts the freedom of the suspect and restricts his or her liberty of movement.  See 5 Am. Jur. 2d Arrest § 4.  The

constitutionality of an arrest is determined by whether there was probable cause.  See Scheuer v. Rhodes, 416 U.S. 232, 245 (1974).  "While an arrest may not culminate in a filing of formal charges, a 'common definition of arrest' is the 'lawful taking of a person into custody in order that he may be forthcoming to answer for the commission of an alleged crime.'"  Williams v. WCAU-TV, 555 F. Supp. 198, 204 (E.D. Pa. 1983) (quoting Miles v. Commonwealth, 304 A.2d 704, 707 (Pa. Commw. Ct. 1973)).

To prevail on a claim of unreasonable seizure based on a false arrest, a plaintiff must establish that they were arrested without probable cause.  See Orsatti v. N.J. State Police, 71 F.3d 480, 482–83 (3d Cir. 1995) (stating that "the Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause").  "[P]robable cause to arrest exists when the facts and circumstance within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Id. at 483.  Probable cause requires more than mere suspicion but "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." See id. at 482–83.  Probable cause is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." See Maryland v. Pringle, 540 U.S. 366, 371 (2003).  While there is no precise definition, the applicable standard for probable cause is:

> whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

See United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).

False imprisonment is "the unlawful detention of another person."[23]  See Signor v. Doe No. 1, No. 13-cv-02627, 2014 WL 3510095, at *3 (M.D. Pa. July 15, 2014) (citing Renk v. City of Pittsburgh v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)).  "Similar to a claim for false arrest pursuant to [Section] 1983, a plaintiff cannot assert a claim for false imprisonment when an officer arrests the plaintiff based upon probable cause."  Id.  "A false imprisonment claim under [Section] 1983 which is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures."  Groman v. Township of Manalapan, 47 F.3d 628, 625 (3d Cir. 1995).

**b.       Arguments of the Parties**

Defendants argue that Plaintiffs were placed under an investigatory detention, which only required reasonable suspicion, as opposed to an arrest requiring probable cause.  (Doc. No. 109 at 10.)  Defendants maintain there was sufficient evidence provided to them to create a reasonable suspicion that a crime had been committed and that Plaintiffs had stolen a onesie from Old Navy.  (Id. at 11–12.)  As part of their investigation, Defendants claim that, once they identified and secured Plaintiffs, they continued a full and thorough investigation, including attempting to search Plaintiffs' vehicle and gathering witness statements "between two different stores located at opposite ends of the shopping center and completing witness interviews" while waiting for the owner of the vehicle, Bellamy, to arrive.  (Id. at 12.)  Defendants posit that whether Plaintiffs committed the crime is irrelevant to the lawfulness of the detention.  (Id.) (citing United States v. Robertson, 305 F.3d 164, 169 (3d Cir. 2002)) (holding that it is "legally insignificant that the detainee is not ultimately identified as the perpetrator").  Defendants state

---

[23]  Plaintiffs' separate state law claim for false imprisonment is discussed infra with Plaintiffs' other state law claims.

that the objective reasonableness of their investigation[24] is strengthened "by the fact that the information indicating that a crime had been committed came primarily from the first-hand information from the purported victim of a crime in a position of authority as a manager of a national retail chain."  (Id.)  Additionally, Defendants note that as police officers, they had a duty to keep the rest of the public safe, and that is why Plaintiffs were moved to a secure location to "free up officers to go back on the streets" while Kepple and Pavone waited for Bellamy to arrive.  (Id. at 12–13.)

Defendants maintain that the four factors articulated in United States v. Sharpe, 470 U.S. 675, 684–87 (1985) ("the Sharpe test"),[25] demonstrate that the investigative detention was

---

[24] Defendants argue that Plaintiffs were subject to an investigatory stop—otherwise known as a "Terry stop."  In Terry v. Ohio, 391 U.S. 1 (1968), the Supreme Court of the United States held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer may make "reasonable inquiries" to investigate the behavior.  See id. at 30.  "Furthermore, if the initial encounter does not dispel the officer's reasonable fear for the safety of himself and others, the officer may 'conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.'"  Verdier v. Borough, 796 F. Supp. 2d 606, 623 (E.D. Pa. 2011) (citing Terry, 392 U.S. at 30).  A Terry stop requires that the police officer "possessed an objectively reasonable suspicion sufficient to justify a Terry stop."  See United States v. Brown, 448 F.3d 239, 250 (3d Cir. 2006) (quoting United States v. Nelson, 284 F.3d 472, 481 (3d Cir. 2002)).  Reasonable suspicion is a "'particularized and objective basis for suspecting criminal activity' based on 'the totality of the circumstances.'"  United States v. Torres, 961 F.3d 618, 623 (3d Cir. 2020) (quoting United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018)).  Because a Terry stop requires a minimum level of objective justification, Defendants assert that they possessed objective justification based on the following: (1) the 911 call from Staton identifying the crime and the perpetrators (which Plaintiffs dispute because Defendants themselves did not hear the call itself before arriving at the scene (Doc. No. 115 ¶ 3)); (2) Kepple's conversation with Staton again identifying that a crime had been committed and that Staton believed Plaintiffs committed that crime; (3) the identification of the Plaintiffs; (4) the identification of Plaintiffs' vehicle by description and photograph; and (5) the new bags and items from Old Navy openly visible in the back of Plaintiffs' vehicle (Doc. No. 109 at 12).

[25] Courts consider the following factors in order to ascertain whether an investigative detention satisfies the Fourth Amendment:

supported by reasonable suspicion and therefore satisfied the Fourth Amendment.  (Doc. No. 109 at 14.)  First, Defendants claim that the duration of the detention (approximately three hours)[26] was "limited to the needs of the investigation which [Defendants] actively engaged in."  (Id. at 14–15.)  Defendants then assert that they were entirely motivated by a legitimate law enforcement purpose to investigate a reported crime.  (Id. at 15.)  As to whether Defendants diligently sought to carry out their legitimate purpose given the circumstances, Defendants argue that they were diligent in securing victim information, interviewing others, securing the vehicle, and searching the items inside.  (Id. at 16.)  Fourth and finally, Defendants maintain that there were no alternative means by which they could have served their law enforcement purpose.  (Id.) In anticipation of Plaintiffs' counterargument, Defendants claim that Kepple did not watch the videotape immediately upon arrival at Old Navy because Kepple's priority was to locate and identify the suspects "reported to have committed a retail theft moments earlier."  (Id. at 17.) Defendants conclude by proffering that Kepple's priority was reasonable and that there is no constitutional requirement to take certain investigative steps in a certain order.  (Id.)

In response, Plaintiffs reject Defendants' contention that they were not arrested, stating that Defendant's argument "is unquestionably incorrect as a matter of law and fact."  (Doc. No.

1. The duration of the stop;
2. The law enforcement purpose justifying the stop;
3. Whether the police diligently sought to carry out those purposes given the circumstances; and
4. Alternative means by which the police could have served their purpose.

See Sharpe, 470 U.S. at 684–87.

[26] Neither party provides evidence to demonstrate how long Plaintiffs were detained, but the parties concede throughout their submissions that Plaintiffs were held for approximately three hours, based on Plaintiffs' second amended complaints (Doc. No. 62 ¶¶ 31, 56–57).  See (Doc. Nos. 109 at 15, 25; 116 at 12–13, 16, 20, 22, 25, 28, 32).

116 at 9.)  Plaintiffs maintain that, even if Defendants initiated a <u>Terry</u> stop, the stop evolved into

a full arrest and detention of Plaintiffs.  (<u>Id.</u> at 10.)  Based on the circumstances of the incident,

Plaintiffs claim that Defendants did not employ the "least intrusive means of detention" by

handcuffing, detaining, and transporting Plaintiffs to the police station.  (<u>Id.</u>)  Plaintiffs state that

Defendants had the opportunity to review the video footage before arresting Plaintiffs but chose

not to do so.  (<u>Id.</u>)  Plaintiffs refute Defendants' argument that an "intermediate response" was

required because Defendants' actions were not brief and could not be excused as "good police

work."  (<u>Id.</u> at 12.)   Plaintiffs posit that, if Defendants had watched the video footage,

Defendants' supposed <u>Terry</u> stop would not have "evolved into an unconstitutional arrest of

several young black women and a juvenile girl for the suspected theft of a $6 onesie."  (<u>Id.</u> at

14.)  Plaintiffs also note that the Court should not rely merely on the parties' characterization of

events, but rather should view the facts as they are depicted by the video.  (<u>Id.</u>) (citing <u>Scott</u>, 550

U.S. at 380–81) (holding that the Court must view the facts in the light depicted by the video).

Plaintiffs assert that, because the video clearly shows that Plaintiffs did not steal anything, a

reasonable jury could find the actions of Defendants to be unreasonable under the circumstances.

(<u>Id.</u>)  Plaintiffs argue that Defendants could not have possessed reasonable suspicion because

there was no evidence that Plaintiffs committed a crime.  (<u>Id.</u> at 14–15.)

      Plaintiffs further argue that, even if the Court finds that they were not arrested, their

detention was unconstitutional because it fails the <u>Sharpe</u> test.  (<u>Id.</u> at 15.)  First, Plaintiffs

maintain that the duration of the stop was unreasonable because Defendants' methods of

investigation reflect a lack of diligence in pursuing an investigation that would confirm or dispel

suspicions quickly.  (<u>Id.</u> at 17.)  Plaintiffs then posit that there was not a law enforcement

purpose to justify the stop—referencing the use of five (5) officers and three (3) patrol cars at the

scene—and there was no interest by the "community at large." (Id. at 18–19.)  As to the third

prong of whether Defendants diligently carried out the investigative purpose, Plaintiffs assert

that a diligent inquiry is not limited to "simply carrying out an investigation and sorting out the

details later." (Id. at 19.)  Finally, Plaintiffs argue that, as to whether alternative means existed

by which the police could have served their purpose, "[i]t defies logic to state, as the Defendants

do in their Brief, that the only means to investigate the suspected theft of a $6 onesie by a single

individual was to apprehend, arrest, detain, imprison, and hold for several hours, the Plaintiffs."

(Id. at 20.)  Because there were "obvious and blatant alternative means" that could have been

used, Plaintiffs claim that there exist genuine disputes of material fact making summary

judgment inappropriate.  (Id. at 22.)

c.      Analysis

At the outset, the Court considers whether Plaintiffs were arrested or subject to an

investigatory detention.  There is "no per se rule that pointing guns at people, or handcuffing

them, constitutes an arrest" and there is "no per se rule about the length of time a suspect may be

detained by the detention becomes a full-scale arrest."  See Baker v. Monroe Township, 50 F.3d

1186, 1192–93 (3d Cir. 1995).  The use of handcuffs "must be justified by the circumstances,"

see id. at 1193, and "an officer may employ handcuffs in the context of a stop to ensure safety or

to prevent a suspect from fleeing."  See Gresh v. Huntingdon County, No. 15-cv-01466, 2016

WL 1162320, at *4 (M.D. Pa. Mar. 24, 2016); see also Baker, 50 F.3d at 1192–93 (stating that

whether the use of force and the duration of detention convert a stop into an arrest depends on

the circumstances).  However, "[a]bsent the exigencies of danger or risk of flight, the detainment

is potentially tantamount to an arrest."  See id. (collecting cases).  In assessing duration, the

26

Court considers "whether the police diligently pursue[d] their investigation." See Sharpe, 470

U.S. at 685 (quoting United States v. Place, 462 U.S. 696, 709 (1983)).

In its December 14, 2022 Memorandum and Order, the Court found that "the Township

Defendants'[27] contention that Plaintiffs were never formally arrested is unavailing, as is their

related contention that, at best, an investigatory stop occurred." (Doc. No. 59 at 11.)  The

undisputed evidence of record confirms that an arrest occurred.  First, as to the duration of

detention, Plaintiffs were held for approximately three hours.[28] See 5 Am. Jur. 2d Arrest § 4

(stating that "[a] suspect is considered under arrest when a police officer interrupts the freedom

of the suspect and restricts his or her liberty of movement"); United States v. Fraguela-Casanova,

858 F. Supp. 2d 432, 443 (M.D. Pa. 2012) (finding that a 94-minute detention was a de facto

arrest); compare Sharpe, 470 U.S. at 688 (holding that a 20-minute stop was an investigatory

detention and not an arrest).  In addition, over those three hours, Plaintiffs were handcuffed,

detained in patrol cars, transported to the police station, and detained in a locked cell and room—

all for the suspected theft of a $6 onesie (Doc. Nos. 110 ¶ 64; 115 ¶ 64), further supporting a

conclusion that Plaintiffs were subject to a de facto arrest.  See United States v. Wrensford, 866

F.3d 76, 87 (3d Cir. 2017) (holding that "the involuntary transportation to the police station and

placement in a custodial setting thereafter constituted a de facto arrest" and that the "line"

between an investigative stop and a de facto arrest was "certainly 'crossed' when the police

forcibly removed [the suspect] from a place he was entitled to be and transported to the police

---

[27]  The current Defendants were included as part of the Township Defendants at the time of the
Court's previous Memorandum and Order.

[28]  See supra at note 26.

station and detained him in a cell").[29]  While there may be issues of "safety and security that

would justify moving a suspect from one location to another during an investigatory detention,"

the undisputed facts of record do not indicate that Plaintiffs were moved from the Outlets and

detained in the police cars (and later, the police station) out of concern for the officers' or the

public's safety.  See id. (quoting Florida v. Royer, 460 U.S. 491, 504 (1983)).  Therefore, the

Court finds that Plaintiffs were subject to a de facto arrest.  See id. at 87–88 (holding that the

suspect was arrested when taken to the police station and placed in a custodial setting).

   Accordingly, the Court turns to the issue of whether probable cause existed for Plaintiffs'

arrest.  At the summary judgment stage, the Court "must assess probable cause based upon the

'totality-of-the-circumstances' available to the arresting officer and view those circumstances in

the light most favorable" to Plaintiffs.  See Harvard v. Cesnalis, 973 F.3d 190, 200 (3d Cir.

2020) (citing Dempsey v. Bucknell Univ., 834 F.3d 457, 467–68 (3d Cir. 2016)).  But, "[t]here is

a tension inherent in evaluating probable cause at the summary judgment stage."  See Dempsey,

834 F.3d at 468 (3d Cir. 2016).  Evaluating the existence of probable cause "will usually be

appropriate for a jury to determine" because the inquiry is "necessarily fact-intensive."  See id.;

see also Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788 (3d Cir. 2000) (holding that,

"[g]enerally, the question of probable cause in a [S]ection 1983 damage suit is one for the jury);

Groman, 47 F.3d at 635 (stating that, "[g]enerally, the existence of probable cause is a factual

issue").  Summary judgment in favor of Defendants is appropriate only if the Court determines

that "a reasonable jury could not find a lack of probable cause."  See Collick v. William Paterson

---

[29]  See also Kaupp v. Texas, 538 U.S. 626, 631–33 (2003) (per curiam) (holding that police
illegally arrested a teenage suspect when they brought him, in handcuffs, to the police station);
Deputy v. Taylor, 19 F.3d 1485, 1491 (3d Cir. 1994) (stating that reasonable suspicion for a
Terry stop "is not enough to allow the police to transport the person stopped to the police station
and extract information through detention").

Univ., No. 21-cv-02281, 2022 WL14002177, at *3 (3d Cir. Oct. 24, 2022) (citing Dempsey, 834 F.3d at 467).

The parties agree that the video footage shows that there was no retail theft and that Defendants could have watched the video prior to arresting Plaintiffs.  (Doc. Nos. 110 ¶ 55; 115 ¶ 55.)  Plaintiffs dispute the reasonableness of Kepple's chosen course of conduct "in not immediately reviewing the video to see if it actually showed the retail theft Ms. Staton was reporting."  (Doc. No. 115 ¶ 55.)  Although Defendants claim that police officers have no general duty to investigate further after acquiring information sufficient to establish probable cause, a plaintiff can "prevail on a false arrest or false imprisonment claim by showing that the arresting officer conducted a constitutionally deficient investigation such that the officer ignored reasonably discoverable exculpatory evidence."  See LeBlanc v. Stedman, No. 10-cv-05215, 2011 WL 6181129, at *5 n.4 (E.D. Pa. Dec. 13, 2011) (citing Kingsland v. City of Miami, 382 F.3d 1220, 1229 (11th Cir. 2004) (holding that an officer may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts")); see also BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (stating that "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest").  The Court concludes that a reasonable factfinder could find no probable cause to arrest because Defendants ignored reasonably discoverable exculpatory evidence by failing to watch the video prior to the arrests of Plaintiffs.[30]

Defendants also argue that their probable cause determination was supported by Staton's eyewitness testimony (Doc. No. 109 at 20, 22–23), the credibility of which Plaintiffs challenge

---

[30]  As discussed supra, the parties agree that the video was not viewed by Defendant prior to Plaintiffs' arrests.  (Doc. Nos. 110 ¶ 26; 115 ¶ 26.)

(Doc. No. 116 at 14–15, 25–27).  However, Staton's credibility[31]  is not material to Defendants'

duty to pursue reasonable avenues of investigation to lawfully formulate probable cause because

Defendants were aware of video footage of the alleged crime.  Defendants may not rely solely on

Staton's allegations "when the officers have before them an exact replication of all information

on which the [eyewitness]'s allegations are based."  See Baptiste v. J.C. Penney Co., 147 F.3d

1252, 1257 (10th Cir. 1998).   The crux of the issue is Defendants' obligation to investigate and

the universe of information Defendants had available to them prior to their alleged formulation

of probable cause.[32]

Viewing the facts of record and all inferences therefrom in the light most favorable to

Plaintiffs, the genuine dispute of material fact concerning the reasonableness of the investigation

that led to the alleged formulation of probable cause precludes resolution of Plaintiffs' Section

1983 claims for unreasonable seizure, false arrest, and false imprisonment claims at summary

judgment.  However, Defendants argue that, even if they arrested Plaintiffs, they are entitled to

qualified immunity.  Accordingly, the Court turns to Defendants' qualified immunity claim.

---

[31]  As discussed supra at note 9, the parties dispute Staton's characterization of the alleged retail
theft that she claimed happened at The Gap.  Compare (Doc. Nos. 110 ¶ 53; 115 ¶ 53).
Defendants state that the objective reasonableness of their investigation is strengthened "by the
fact that the information indicating that a crime had been committed came primarily from the
first-hand information from the purported victim of a crime in a position of authority as a
manager of a national retail chain."  (Doc. No. 109 at 12.)  Examination of the alleged
formulation of probable cause may include an assessment of Staton's credibility, which is
inappropriate for this Court to determine at summary judgment.  See Anderson, 477 U.S. at 255
(holding that, "[i]n considering a motion for summary judgment, a district court may not make
credibility determinations or engage in any weighing of evidence").

[32]  The parties dispute the materiality of the 911 call recording with Plaintiffs arguing that the
911 call recording is immaterial "as there are no facts of record tending to prove that any of the
defendant police officers heard any portion of the 911 call prior to encountering, detaining,
and/or arresting Plaintiffs."  (Doc. No. 115 ¶ 3.)  Defendants claim that the 911 call factors into
their objective justification to detain Plaintiffs.  (Doc. No. 109 at 12.)

### 3.    Qualified Immunity As to Plaintiffs' Section 1983 Claims for Violations of the Fourth Amendment[33]

Defendants next argue that, even if they arrested Plaintiffs, they are entitled to qualified

immunity because Defendants relied upon firsthand information from the purported victim

(Staton) that a crime had been committed by Plaintiffs to lawfully formulate probable cause.  As

an initial matter, the Court notes that the Third Circuit has recognized a tension in an effort to

resolve immunity issues where factual disputes exist as to probable cause.  In Sherwood v.

Mulvihill, 113 F.3d 396 (3d Cir. 1997), the Third Circuit noted as follows:

> tension exists as to the proper role of the judge and jury where qualified immunity
> is asserted.  Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996). The
> Supreme Court has held that the application of qualified immunity is a question of
> law.  Siegert [v. Gilley], 500 U.S. [226,] 232 [(1991)].  In contrast, the existence of
> probable cause to support a warrant, when raised in a section 1983 action, is a
> question of fact.  Groman [v. Township of Manalapan], 47 F.3d [628,] 635 [(3d Cir.
> 1995)].  This may prove problematic in attempting to resolve immunity issues in
> the early stages of litigation where a genuine and material factual dispute exists
> concerning probable cause.

See Sherwood, 113 F.3d at 401 n.4.

---

[33]  As noted in the Court's December 14, 2022 Memorandum and Order:

> [T]he Court is mindful of the requirement that courts "analyze separately the
> conduct of each [defendant]" as applied to each asserted claim when assessing a
> qualified immunity defense asserted by multiple defendants.  See Grant v. City of
> Pittsburgh, 98 F.3d 116, 123 (3d Cir. 1996).  However, [Defendants] do not argue
> that one or more [Defendants] should be treated differently for purposes of qualified
> immunity, and it is their burden to do so.  See Balcom, 2022 WL 950039, at *2.

(Doc. No. 59 at 21.)  In their arguments concerning qualified immunity at summary judgment,
Defendants again do not distinguish among individual Defendants.  (Doc. No. 109 at 19–25.)
Because Defendants have not put forth arguments to demonstrate that one or more Defendants
should be treated differently, the Court will address Defendants together for purposes of
qualified immunity.

### a.    Applicable Legal Standard

In its December 14, 2022 Memorandum and Order, the Court previously discussed

qualified immunity in connection with its resolution of the then-pending motion to dismiss:

> Qualified immunity "protects government officials from liability for civil damages
> unless a plaintiff pleads facts showing (1) that the official violated a statutory or
> constitutional right, and (2) that the right was 'clearly established' at the time of the
> challenged conduct."   See Wood v. Moss, 572 U.S. 744, 745 (2014) (internal
> quotation marks omitted).  Because qualified immunity "is an affirmative defense,"
> the "burden of proving the prerequisites for its application rests with the party
> seeking to invoke it," see Balcom v. City of Pittsburgh, No. 2:19-cv-00506, 2022
> WL 950039, at *2 (W.D. Pa. Mar. 30, 2022), . . . .

(Doc. No. 59 at 13–14.)  On a motion for summary judgment, the Court considers: (1) "whether

the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal

right," and (2) "whether that right was clearly established."  See Mack v. Yost, 63 F.4th 211, 227

(3d Cir. 2023) (citing Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021)).

### b.    Arguments of the Parties

Defendants claim that, assuming they arrested Plaintiffs, they are entitled to qualified

immunity due to the lawful formulation of probable cause.  (Doc. No. 109 at 18.)  Defendants

maintain that "the apparent reliability of Ms. Staton [is] beyond reproach and contribute[d] to the

[Defendants]' formulation of probable cause."  (Id. at 20.)  Defendants argue that there was

probable cause based on Staton's statement, witness identification, and claim of video evidence

of the crime.  (Id. at 22–23.)  Defendants note that Staton made a mistake and "through a

diligent, professional investigation the [Defendants] identified this mistake with reasonable

promptitude."  (Id. at 24.)  Because there is "clear precedent that an officer may rely on a

victim's identification and account of a purported crime in formulating probable cause,"

Defendants argue that they are entitled to qualified immunity as a matter of law.  (Id. at 25.)

In response, Plaintiffs maintain that, because a jury could reasonably conclude that Defendants did not have probable cause to arrest Plaintiffs, and thus violated a clearly established right, Defendants are not entitled to summary judgment on the basis of qualified immunity.  (Doc. No. 116 at 22–23.)  Plaintiffs claim that "it is clear that a reasonable person would not believe that the Plaintiffs committed retail theft based solely on the statement of a store employee . . . ."  (Id. at 24–25.)  Because Defendants "relied on the hunch of a store employee, expanded that hunch to several more individuals, and proceeded to deprive the Plaintiffs of their liberty," and failed to use the video evidence that would exonerate Plaintiffs, Plaintiffs maintain that Defendants are not entitled to qualified immunity.  (Id. at 25–26.) Plaintiffs acknowledge that, although Defendants did not need to prove guilt beyond a reasonable doubt to formulate probable cause, the law requires Defendants to have some reasonable evidence that Plaintiffs committed a crime.  (Id. at 27.)  Therefore, Plaintiffs assert that Defendants' conduct clearly violated Fourth Amendment rights that were known and clearly established at the time.  (Id. at 29.)

### c.   Analysis

There is no dispute that Defendants are considered government officials under the doctrine of qualified immunity as they are all police officers.  See Orsatti, 71 F.3d at 483 (stating that police officers are government officials accorded qualified immunity).  As set forth supra, the two-prong test for qualified immunity at summary judgment is (1) "whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right," and (2) "whether that right was clearly established."  See Mack, 63 F.4th at 227 (citing Peroza-Benitez, 994 F.3d at 165).

Regarding the first prong of the qualified immunity analysis—whether a legal right was violated—the Court concludes that, as discussed <u>supra</u>, viewing all evidence of record in the light most favorable to Plaintiffs, and construing all inferences in their favor, a reasonable factfinder could find that Defendants lacked probable cause to arrest Plaintiffs and therefore violated Plaintiffs' Fourth Amendment rights.  As stated in the Court's December 14, 2022 Memorandum and Order, the Court next must:

> "decid[e] if the particular right outlined in [Plaintiffs' complaint] was clearly established at the time of [their arrests]." <u>See</u> <u>Clark v. Coupe</u>, No. 21-2310, 2022 WL 17246324, at *8 (3d Cir. Nov. 28, 2022) (finding dismissal for qualified immunity "premature given the nature of [the plaintiff's] allegations").  In doing so, the Court must consider "whether the state of the law when the offense occurred gave the [Officer Defendants] fair warning that their conduct violated [Plaintiffs'] [Fourth] Amendment right[s]." <u>See</u> <u>id.</u> (internal quotation marks omitted).  "To determine whether such 'fair warning' existed," the Court must "search first for 'factually analogous' cases in the Supreme Court, and then turn [its] inquiry to whether 'binding opinions from [the Third Circuit]' were in existence." <u>See</u> <u>id.</u> (quoting <u>Peroza-Benitez v. Smith</u>, 994 F.3d 157, 165 (3d Cir. 2021)).  If "neither source provides relevant caselaw, [the Court] consider[s] whether a robust consensus of cases of persuasive authority in the Court of Appeals could clearly establish a right for purposes of qualified immunity," and the Court "may also take into account district court cases." <u>See</u> <u>id.</u> (internal quotation marks omitted).
>
> The above framework requires the Court to first "identify the specific right [Plaintiffs] allege[] was violated." <u>See</u> <u>id.</u> "This requires [the Court] to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" <u>Id.</u> (quoting <u>Peroza-Benitez</u>, 994 F.3d at 165).  Although a "right must be defined with a high degree of specificity to be clearly established," <u>see</u> <u>Dennis v. City of Phil.</u>, 19 F.4th 279, 288 (3d Cir. 2021), "state officials can still receive fair warning that their conduct is violative even in 'novel factual circumstances' never previously addressed in caselaw." <u>See</u> <u>Clark</u>, 55 F.4th at 182 (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)).

<u>See</u> (Doc. No. 59 at 14–15) (alteration in original).

Based on this framework, the Court, in its December 14, 2022 Memorandum and Order, concluded that the "particular conduct at issue" was the Officer Defendants' "seizure, arrest, and detention of Plaintiffs for retail theft based on video surveillance that demonstrated that no theft

had occurred."  See (id. at 15) (citing Clark, 2022 WL 17246324, at *9).  The Court defined the

right allegedly violated as follows: "the right to be free from a seizure/arrest/detention based on

the accusations of retail theft where the only objective evidence upon which the accusations were

based—video surveillance—showed that no theft had occurred."  See (id. at 16) (citing Clark,

2022 WL 17246324, at *9).  However, at the present stage of summary judgment,

> [i]t is essential to begin by "fram[ing] the right 'in light of the specific context of
> the case,'" with all reasonable inferences drawn in the nonmovant's favor.  Peroza-
> Benitez, 994 F.3d at 165–66; accord Tolan v. Cotton, 572 U.S. 650, 657, 134 S.Ct.
> 1861, 188 L.Ed.2d 895 (2014) ("Our qualified-immunity cases illustrate the
> importance of drawing inferences in favor of the nonmovant, even . . . [on] the
> clearly-established prong of the standard.").  The Supreme Court has repeatedly
> cautioned that the qualified immunity inquiry demands a "high 'degree of
> specificity'" and that courts may not "define clearly established law at a high level
> of generality," which would "avoid[ ] the crucial question whether the official acted
> reasonably in the particular circumstances that he or she faced."  District of
> Columbia v. Wesby, —— U.S. ——, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018).

See Mack, 63 F.4th at 228.  "This is an 'objective (albeit fact-specific) question,' where '[an

officer]'s subjective beliefs . . . are irrelevant.'"  Peroza-Benitez, 994 F.3d at 165 (citing

Anderson v. Creighton, 483 U.S. 635, 641 (1987)).  In line with the above framework, the Court

defines the right at this stage of proceedings as follows: "the right to be free from a

seizure/arrest/detention based on the accusations of retail theft when officers did not pursue

reasonable avenues of investigation."  In other words, the right concerns the nature of the

investigation upon which the formulation of probable cause was based.

Although the right defined by the Court differs slightly from the Court's characterization

of the right in its previous Memorandum and Order due to the development of a factual record,

the Court refers to its still-relevant discussion in its previous Memorandum and Order:

> In "determining whether this articulated right was clearly established at the time"
> of the Defendants' conduct, the Court must "broaden the scope beyond determining
> whether 'the very action in question has been held unlawful.'"  See Clark, 2022
> WL 17246324, at *9 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

"The Supreme Court does not require that earlier cases share the same or even similar facts for a right to be deemed clearly established; it is enough that the prior cases are 'factually analogous.'" Id. (quoting Peroza-Benitez, 994 F.3d at 165). The inquiry into analogous case law similarly requires the Court to "take[] a broad view of what constitutes an established right of which a reasonable person would have known." See id. (citing Peroza-Benitez, 994 F.3d at 166).

Undertaking this inquiry, the Court notes at the outset that Plaintiffs have not pointed to any authority, either in the Supreme Court or the Third Circuit, involving the same facts alleged in this case. Nor has the Court found any such authority. Nevertheless, and as discussed above, the Court's inquiry is broader in scope than a mere determination as to whether precedential authority has addressed the same or closely similar factual circumstances as presented here. Instead, the Court's task is to look to factually analogous precedent to determine whether the Defendants had fair warning that their alleged conduct was unlawful. As discussed below, there is ample authority upon which to conclude that Defendants had such fair warning.

As a preliminary matter, the Court's determination as to "whether it would be clear to a reasonable officer that [Defendants'] conduct was unlawful" involves an "examination of the crime at issue," which is retail theft. See Gilles v. Davis, 427 F.3d 197, 203–04 (3d Cir. 2005) (internal quotation marks omitted). Under Pennsylvania law, "[a] person is guilty of a retail theft if," in relevant part:

> [he or she] takes possession of, carries away, transfers or causes to be carried away or transferred, any merchandise displayed, held, stored or offered for sale by any store or other retail mercantile establishment with the intention of depriving the merchant of the possession, use or benefit of such merchandise without paying the full retail value thereof.

See 18 Pa. C.S.A. § 3929(a)(1). The Court must determine whether Defendants, by accusing and then seizing, arresting, and detaining Plaintiffs for allegedly carrying away merchandise under the circumstances presented here, violated a clearly established right.

Almost three decades ago, the Third Circuit held that there "is no question that . . . the right to be free from arrest except on probable cause[] was clearly established." See Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995); see also Andrews v. Scuilli, 853 F.3d 690, 705 (3d Cir. 2017) (same). The Third Circuit has also stated that "[p]olice officers clearly know that they need probable cause to arrest someone and we can assume that they know they face personal liability if they arrest someone without probable cause." See [George v. Rehiel, 738 F.2d 562, 583 (3d Cir. 2013)].

. . . .

Additionally, numerous district courts in this circuit have defined, as a sufficiently specific, clearly established right for the purpose of analyzing a qualified-immunity defense, the right to be free from arrest except upon probable cause. See Donohue v. Rineer, No. 1:10-cv-01324, 2010 WL 5135892, at *5 (M.D. Pa. Dec. 10, 2010) (adopting definition of clearly established right as the right to be free from an arrest on a warrant unless "supported by probable cause"); see also, e.g., Catalano v. City of Newark, No. 15-cv-04189, 2017 WL 6265090, at *11 (D.N.J. Dec. 8, 2017) (stating, "[t]here should be no doubt that the right to be free from arrest without probable cause is clearly established").

(Doc. No. 59 at 16–17, 19–20.) (alteration in original)

Defendants argue, as they did in connection with their motion to dismiss, Staton was reliable as an informant and that they had probable cause to arrest Plaintiffs based on the information they had at the time of the incident.  (Doc. No. 109 at 13, 18–25, 27.)  At the motion to dismiss stage, the Court stated that:

> [a]ccording to []Defendants, probable cause was properly based on the information gathered from Staton, whom Defendants argue was reliable as an informant or as a victim of the alleged crime under the multi-factor test in United States v. Torres, 534 F.3d 207 (3d Cir. 2008). (Doc. Nos. 37 at 23–28, 51 at 19–22.) Even assuming Torres, which addressed probable cause in the context of a motion to suppress evidence in a criminal case, applied in this context, the allegations in Plaintiffs' amended complaints do not support this theory. The timeline reflected in the amended complaints indicates that Staton told Officer Kepple she was reviewing the Gap's surveillance footage because Roman had called her stating that "the individuals depicted on the video had been 'acting suspicious' and had 'stolen from them big time.'"  (Doc. Nos. 26 ¶ 41, 27 ¶ 40.)  From that allegation, it can be reasonably inferred that Staton did not first observe any theft before watching the video and relied on the video alone for her statement that Quany[ea] had stolen the onesie.  The objective facts that were observable in the video would, as a matter of common sense, defeat any reasonable belief that was based on Staton's description of the video.

See (Doc. No. 59 at 20–21) (footnotes omitted).  The Third Circuit has noted that, when assessing qualified immunity for a  Fourth Amendment claim, a district court should focus on "the information the officers had available to them, not on whether the information resulted from exemplary police work."  See Orsatti, 71 F.3d at 484.

At time of their decision to detain Plaintiffs, Defendants had Staton's identification of Plaintiffs and the underlying video footage.  The parties agree that Defendants were given a copy of the video, but did not watch it prior to the arrests of Plaintiffs.  (Doc. Nos. 110 ¶¶ 26, 55; 115 ¶¶26, 55.)   In determining whether an officer has sufficient reasonably trustworthy information to constitute probable cause, clearly established case law requires officers to look at the "totality-of-the-circumstances."  See Illinois v. Gates, 462 U.S. 213, 238 (1983).  Probable cause is an objective inquiry, "based on the facts available to the officer at the time."  See Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994).  As properly noted by Defendants, officers may rely upon identifying information from the victim of the crime when formulating probable cause.[34]  See (Doc. No. 109 at 22) (citing Petaccio v. Davis, 76 F. App'x 442, 445 (3d Cir. 2003) (unpublished) (stating that a victim's identification "may validly provide probable cause")).

In connection with the instant motion, Defendants do not point to a factually analogous case and instead attempt to reargue the right as articulated in the Court's previous Memorandum and Order.  In the absence of a factually analogous case, "either from binding Supreme Court and Third Circuit precedent," the Court can consider whether Defendants violated a right that had been clearly established by a "robust consensus of persuasive authority in the Courts of Appeals."  See Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted). "[L]aw enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so—provided that the mistake is objectively reasonable."  Kuehl v. Burtis, 173 F.3d 646, 649–50 (8th Cir. 1999) (citing Hunter v. Bryant, 502

---

[34]  An informant's "reliability" and "basis of knowledge" are "better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations."  See Gates, 462 U.S. at 233.

U.S. 224, 228–29 (1991)).  "The issue for immunity purposes is not probable cause in fact but arguable probable cause."  Id. (citing Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996)).  However, a defendant may not rely solely on an eyewitness's allegations "when the officers have before them an exact replication of all information on which the [eyewitness]'s allegations are based."  See Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1257 (10th Cir. 1998). Although a victim witness's positive identification is usually sufficient to establish probable cause, plainly exculpatory evidence "could outweigh that identification and preclude a finding of probable cause."  See Goodwin v. Conway, 836 F.3d 321, 328 (3d Cir. 2016) (citing Wilson at 212 F.3d at 790) (emphasis added).  "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest."  BeVier, 806 F.2d at 128.

In Baptiste, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") found that, "[w]hile officers may weigh the credibility of witnesses in making a probable cause determination, they may not ignore available and undisputed facts" when conducting an investigation.  See Baptiste, 147 F.3d at 1259 (emphasis in original).[35]  The officers in Baptiste contended that, because officers may generally rely on observations made by a witness absent

---

[35]   In support, the Tenth Circuit cites the following cases:

> Cf. Romero[v. Fay], 45 F.3d [1472,] 1476–77 & n. 2 [(10th Cir. 1995)] (noting that while officers do not have duty to interview alleged alibi witness once probable cause is established, the probable cause standard "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention"); Clipper v. Takoma Park, Md., 876 F.2d 17, 19–20 (4th Cir.1989) (sustaining jury verdict that police officer lacked probable cause to arrest plaintiff because officer relied on speculative information while ignoring readily available exculpatory evidence); BeVier, 806 F.2d at 128 (stating that "police officer may not close her or his eyes to facts" and that "[r]easonable avenues of investigation must be pursued").

Baptiste, 147 F.3d at 1259.

other evidence, "there is a disincentive to view a videotape." See id. at 1257 n.8.  The Tenth

Circuit rejected this argument, stating that, "[a]bsent exceptional circumstances, however, when

a videotape of the conduct at issue is both known and readily accessible to an officer

investigating an alleged crime, the officer must view the videotape so as to avoid improperly

delegating the officer's duty to determine probable cause."  See id.  Further, "[w]hile officers are

not required to conduct full investigations before making an arrest, an officer may not ignore a

videotape which records the alleged criminal acts."  See id.; see also Romero v. Fay, 45 F.3d

1472, 1476–77 (10th Cir. 1995) (noting that probable cause requires officers to "investigate basic

evidence"); Sevigny v. Dicksey, 846 F.2d 953, 957–58 (4th Cir. 1988) (holding officer who

failed to "avail himself of readily available information" during his investigation which would

have confirmed plaintiff's explanation of events was not entitled to qualified immunity for

unlawful arrest).  "[P]robable cause does not exist when 'a minimal further investigation' would

have exonerated the suspect(s)."  Kuehl, 173 F.3d at 650 (citing Bigford v. Taylor, 834 F.2d

1213, 1219 (5th Cir. 1988)).

Likewise, in BeVier, the United States Court of Appeals for the Seventh Circuit

("Seventh Circuit") found that "[r]easonable avenues of investigation must be pursued" and it is

up to the officer(s) to extract information.  See BeVier, 806 F.2d at 128.  The Seventh Circuit

concluded that, because the "information could have been easily obtained and was necessary

before concluding" that a crime had been committed, the officer was "unreasonable in not

making those inquiries."  See id.  "Although the police must be allowed some margin of error, a

police officer evaluating a situation for probable cause must utilize the means at hand to

minimize the risk of error."  Id. (citing 1 LaFave, Search & Seizure § 3.2, at 467).

Based on the above authority, and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that the right to be free from a seizure/arrest/detention based on an accusation of retail theft under the circumstances where officers did not pursue reasonable avenues of investigation is clearly established.  Although Defendants argue that the eyewitness testimony of Staton was enough evidence upon which to formulate probable cause, this evidence did not relieve Defendants of their duty to pursue reasonable avenues of investigation. Accordingly, Defendants are not entitled to qualified immunity, and the Court will deny Defendants' motion for summary judgment on this basis.

**B.    Plaintiffs' State Law Claims of False Arrest, False Imprisonment, Assault, and Battery**[36]

Defendants assert that they are entitled to summary judgment as to Plaintiffs' state law claims of false arrest, false imprisonment, assault, and battery (Count IV) due to their lawful formation of probable cause.[37]

**1.    Applicable Legal Standards**

**a.    False Arrest and False Imprisonment**

---

[36]  Plaintiffs Quashae and Quanyea assert a state law claim of false arrest in their second amended complaint.  (Doc. No. 61 ¶ 84.)  Plaintiff Trinity does not assert a false arrest claim in her second amended complaint, but includes the other state law claims.  (Doc. No. 62 ¶ 92.) However, as discussed infra, false arrest and false imprisonment are "identical theories of liability."  See Braswell v. Wollard, 242 A.3d 973, 979 (Pa. Super. Ct. 2020).

[37]  As noted in this Court's previous decision, "while Plaintiffs broadly allege that the Officer Defendants' 'acts and omissions . . . constitute[d] willful misconduct and negligence as well as assault, battery, false arrest, and false imprisonment,' Plaintiffs do not appear to assert standalone claims for negligence and misconduct."  See (Doc. No. 59 at 26) (internal citations omitted).  The Court limited "its analysis of Plaintiffs' state law claims to their asserted causes of action for assault, battery, [] false arrest and imprisonment, all based on allegations of willful conduct."  (Id.)  Defendants do not address willful misconduct and negligence in their motion for summary judgment as to Plaintiffs' state law claims.

Under Pennsylvania law, false arrest is synonymous with false imprisonment.  See Gagliardi v. Lynn, 285 A.2d 109, 111 (Pa. 1971) (concluding that, "in cases where defendant purports to act for the purpose of securing the administration of the law without actual legal justification, 'false arrest' is synonymous with false imprisonment"); see also Braswell v. Wollard, 242 A.3d 973, 979 (Pa. Super. Ct. 2020) (stating that "these two civil causes of action are identical theories of liability").  False arrest and false imprisonment are both defined as the unlawful detention of another person.  See Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010) (stating that the elements of false arrest/false imprisonment are "(1) the detention of another person (2) that is unlawful").  "An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not."  Renk, 641 A.2d at 293.  "More specifically, liability for false imprisonment attaches where: (a) one acts intending to confine another within boundaries fixed by the actor, (b) his act results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it."  Kintzel v. Kleeman, 965 F. Supp. 2d 601, 608 (M.D. Pa. 2013).

### b.      Assault and Battery

Under Pennsylvania state law, "[a]n assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  See Renk, 641 A.2d at 293.  Assault requires that a defendant act with the intent to place a plaintiff in apprehension of imminent harmful or offensive bodily contact and that the plaintiff actually experience such apprehension.  See Gresh, 2016 WL 1162320, at *7 (citing Heverly v. Simcox, No. 05-cv-01370, 2006 WL 2927262, at *9 (M.D. Pa. Oct. 11, 2006)) (applying Pennsylvania law).  "Battery

requires proof that the defendant acted with the intent to cause harmful or offensive contact with the person of the plaintiff and that such contact actually followed." Id.

"Police officers are privileged to commit these torts during a lawful arrest supported by probable cause." Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 557 (M.D. Pa. 2008) (applying Pennsylvania law). However, "[a] police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive . . . . " See Renk, 641 A.2d at 293. A police officer can be found liable for assault and battery if the police officer's conduct was unprivileged. See Mills, 589 F. Supp. 2d at 557 (stating that probable cause confers police officers with the privilege to inflict these torts).

### 2.    Arguments of the Parties

Defendants argue that Plaintiffs' state law claims of false arrest, false imprisonment, assault, and battery must fail because Defendants possessed probable cause. (Doc. No. 109 at 27.) Defendants again note that they do not concede that Plaintiffs were arrested, but "even assuming arguendo [Plaintiffs] were, these claims must fail." (Id.) Defendants claim that the record clearly establishes that Staton was credible, based on her accurate description of Plaintiffs and her knowledge of the alleged retail theft, and that Staton's information was sufficient to formulate probable cause. (Id. at 28–29.) Based on their formulation of probable cause, Defendants assert that they are entitled to summary judgment on Plaintiffs' state law claims.

In response, Plaintiffs first argue that the question of whether the police have probable cause is one for the jury. (Doc. No. 116 at 31.) Plaintiffs note that a jury, based on the facts in the record, could find that the Defendants lacked probable cause. (Doc. No. 116 at 32.) Even if Defendants did not deliberately arrest Plaintiffs without probable cause, Plaintiffs argue that Defendants are still liable for false imprisonment. (Id.) Plaintiffs maintain that "immediately

43

handcuffing the young, physically small female Plaintiffs, placing them in patrol cars, waiting for 45 minutes, and then being transported to holding cells only to be released hours later may be interpreted by a jury as 'unnecessary or excessive' thereby creating liability for assault and battery."  (Id.)

### 3.    Analysis

As discussed supra regarding Plaintiffs' Fourth Amendment claims, there exist genuine disputes of material fact pertaining to the issue of Defendants' probable cause to arrest Plaintiffs. Accordingly, the Court concludes that genuine disputes of material fact similarly exist as to whether Plaintiffs were falsely imprisoned and falsely arrested by Defendants.  See Renk, 641 A.2d at  293 (holding that a police officer may be liable for false imprisonment "when a jury concludes that he did not have probable cause to make an arrest").  Similarly, because reasonable minds could differ regarding the existence of probable cause, there exists a genuine dispute of material fact as to whether Defendants were privileged to commit assault and battery pursuant to a lawful arrest.  See Mills, 589 F. Supp. 2d at 557 (applying Pennsylvania law).

In sum, the Court cannot resolve Plaintiffs' state law claims of false arrest, false imprisonment, assault, and battery on a motion for summary judgment because there are genuine disputes of material fact as to the existence of probable cause for Plaintiffs' arrests.  Thus, the Court will deny Defendants' motion for summary judgment as to the state law claims of false arrest, false imprisonment, assault, and battery (Count IV).[38]

---

[38]  As to Defendants' argument that Pavone and Bell should be dismissed as a matter of law because there are no claims against them, the Court notes that there is a genuine dispute of material fact as to level of involvement of these two Defendants that precludes resolution of the claims against them on a motion for summary judgment.  Despite Defendants' claim that there is not a "scintilla of evidence asserted in the record" concerning the actions of Pavone and Bell, Plaintiffs have pointed to evidence in the record that implicates the actions of Pavone and Bell during the December 2020 incident.  See supra at note 11.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motion.  (Doc. No. 108.)  An appropriate Order follows.


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania